IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOSLYN STABLER, | CASE NO. 1:25-CV-01329-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

### INTRODUCTION

Plaintiff Joslyn Stabler challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1) The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of June 26, 2025). The parties then consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #5). For the reasons below, I **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. Stabler applied for DIB and SSI on March 23, 2023, alleging she became disabled on September 21, 2021. (Tr. 744, 746). After the claims were denied initially and on reconsideration, Ms. Stabler requested a hearing before an Administrative Law Judge. (Tr. 540-51, 554-65, 567-75, 576-84, 626). In June 2024, Ms. Stabler (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 512-38). On June 26, 2024, the ALJ determined Ms. Stabler was not disabled. (Tr. 11-22). On April 28, 2025, the Appeals Council denied her request for review of the

1

ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. §§ 404.981, 416.1481). Ms. Stabler timely filed this action. (ECF #1).

FACTUAL BACKGROUND

I.      **Personal and Vocational Evidence**

Ms. Stabler was 49 years old on her alleged onset date and 51 years old at the administrative hearing. (*See* Tr. 540, 514). She has a high school diploma and is certified a state-tested nursing assistant. (*See* Tr. 551, 2736). She has worked as a nurse assistant. (Tr. 529).

II.     **Medical Evidence**

A.      **Physical Impairments**

Ms. Stabler's physical impairments can be traced to a 2019 workplace injury where she was helping lift a bariatric patient after which she began experiencing pain in her lower abdomen and later in her back and right shoulder. (*See* Tr. 1054, 1569). Ms. Stabler experiences daily chronic pain in her hands, arms, shoulder, and neck. (Tr. 518). After she reported foot pains in 2024, she was diagnosed with plantar fasciitis (an inflammation in the heel). (Tr. 3009). Ms. Stabler is also diagnosed with diabetes. (Tr. 860).

After an August 2020 course of physical therapy did not improve Ms. Stabler's back and arm pain, she underwent an MRI that showed "some disc bulges at C5-6 and C6-7 without spinal cord compression and/or significant neural foraminal stenosis" and "a small anterior disc bulge at T2-T3 without cord compression." (Tr. 1807-09). A 2020 CT scan of her cervical spine similarly showed a broad-based bulge at the C6-C7 level "causing moderate effacement of the anterior subarachnoid space with mild mass effect and posterior displacement of the cord without any cord edema," a right paracentral disc bulge at the C5-C6 level, "causing mild-to-moderate effacement of the anterior subarachnoid space without any mass effect on the cord," and a disc protrusion at the

2

T2-T3 level "indenting the anterior thecal sac" but a "lack of axial images through this region limits evaluation" and there was "[n]o cord edema." (Tr. 1059).

In November 2020, Ms. Stabler received treatment for shoulder, chest, and arm pain. (Tr. 1054). A physical examination did not indicate cervical radiculopathy but instead suggested signs of carpal tunnel syndrome in her right wrist and arthritis; also, it did not rule out rotator-cuff pathology or complex regional pain syndrome. (Tr. 1054). In January 2021, her physician suspected a disc herniation in her neck was causing her neck and arm pain, while her shoulder pain was from arthritis or tendinitis (though again not ruling out a less likely rotator-cuff pathology). (Tr. 1061). She was referred for shoulder physical therapy and prescribed medications. (*Id.*).

From September 2021 to December 2022, Ms. Stabler attended regular physical therapy and pain-management treatment for her neck, shoulder, chest, and arm pain. (*See* Tr. 1907, 1911, 1916, 1918, 1891, 1895, 1899, 1903, 1922, 1927, 1932, 1936) (ordered chronologically). She received injections for shoulder pain that provided temporary relief. (*See* Tr. 1907, 1899). Examinations generally found tenderness to palpation throughout her upper body, various range-of-motion limitations, 3-to-4 out of 5 strength in her right arm, and a slow gait. (*See* Tr. 1908-09, 1912-13, 1892, 1896, 1900, 1904, 1923-24, 1933). There was a one-year gap between October 2021 and 2022 while she consulted her doctor about increased pain. (Tr. 1920). In one appointment, she reported her arm got "stuck" when she tried to lift it over her head. (Tr. 1916). In another, she used her right arm while elaborating or talking. (Tr. 1911).

An MRI of Ms. Stabler's right shoulder was taken in August 2021 that revealed "moderate tendinosis with a rim rent tear involving the anterior fibers of supraspinatus near the insertion

accompanied by few linear interstitial tears in the middle and posterior fibers, as well as mild insertional tendinosis of the subscapularis." (Tr. 1831).

That MRI was reviewed in May 2022 with Ms. Stabler's physician concluding "there is no full-thickness tearing in the rotator cuff" though she did "have early degenerative change at the glenohumeral joint." (Tr. 1983). An examination found a lesser range of motion in her right shoulder compared to her left, 5/5 right rotator cuff strength, and pain with testing maneuvers. (*Id.*). That month, an x-ray of her right shoulder revealed "[m]ild degenerative changes of the glenohumeral joint" and "[m]inimal to mild degenerative change of the acromioclavicular joint." (Tr. 2007). In a pain-management appointment in September 2022, she reported spending 15 hours each day in bed or reclining and her pain caused her headaches and fatigue. (Tr. 1586-87). She was diagnosed with fibromyalgia and chronic pain syndrome. (Tr. 1587). An October 2022 cervical spine x-ray showed spondylosis of the cervical spine and a reversal of normal cervical spine curvature either "related to patient positioning or muscle spasm." (Tr. 2002-04).

Over 2023 and 2024, Ms. Stabler was routinely treated for musculoskeletal pain by her primary-care physician, Valerie Coats, M.D. (*See, e.g.*, Tr. 2665, 2761-62, 2982). In April, she reported pain in her hips that worsened and was aggravated with prolonged sitting, radiated to both her feet, and caused decreased mobility, joint tenderness, and muscle spasms (Tr. 2665). An examination revealed tenderness in her neck, lower back, and hips, but normal range of motion in her legs. (Tr. 2670). But in May, she reported 0/10 pain when she saw Dr. Coats regarding her allergies and anxiety. (Tr. 2762). A separate examination in May showed no "upper motor neuron signs or active synovitis" (shoulder joint inflammation) in her arm or leg joints, though there was tenderness "suggestive of fibromyalgia." (Tr. 2354). In January 2024, her musculoskeletal pain was

4

in her feet, causing decreased mobility in her legs. (Tr. 2982). She rated her pain as a 10/10. (Tr. 2991). In a separate examination in January, she reported shoulder, clavicle, and lower-back pain, as well as tingling in her hands and feet that she attributed to diabetic neuropathy. (Tr. 327). She was evaluated for, and diagnosed with, fibromyalgia. (Tr. 329). She was instructed to begin an exercise regimen but had not started it by July. (Tr. 329, 413). She restarted chiropractic treatment but with little change in symptoms. (Tr. 462, 457, 452, 447, 443).

In October 2024, a few months after the administrative hearing, Ms. Stabler presented to the emergency room with chest pains. (Tr. 134, 149). Her chest pain was assessed to be an acute exacerbation of her chronic pain. (Tr. 149). After her pain improved over the day, she was discharged. (Tr. 150, 177, 234). She was instructed to follow-up with her primary-care and pain-management physicians and take over-the-counter pain relievers as needed. (*Id.*). When she followed up with her pain-management physician, an examination showed full range of motion in her elbows and wrists and a limited range of motion in her right shoulder. (Tr. 264-65). She received an injection in her shoulder for temporary relief, with another in three months. (Tr. 265).

Ms. Stabler is also diagnosed with diabetes beginning in 2020. (Tr. 860). Her diabetes was characterized as "stable" and "without complications." (Tr. 860, 2970, 2982). It is managed with oral medication and home glucose readings. (Tr. 860, 1523, 2911, 2971-72, 2982). Her diabetes causes tingling, burning, and numbness in her feet. (Tr. 327, 3010).

In February 2024, Ms. Stabler was diagnosed in her right foot with plantar fasciitis, an inflammation of the tissue connecting the heel bone and toes that causes heel pain. (Tr. 3009, 3022). After this diagnosis, an x-ray of her right foot showed minimal joint space loss in her ankle, a small plantar calcaneal spur, and no cortical or stress fracture. (Tr. 3065-66). She was referred for

orthotic shoes, prescribed over-the-counter anti-inflammatory gel, and instructed to stretch her foot. (Tr. 3009, 3022). A physical examination found she had a normal range of motion in her ankles, normal sensation in her feet, and normal gait. (Tr. 3011, 3022).

### B.     Mental Impairments[1]

Ms. Stabler is diagnosed with several mental health conditions including anxiety, post-traumatic stress, and major depressive disorders. (*See, e.g.*, Tr. 861, 953). In September 2022, she was referred to a psychiatrist to evaluate potential psychological contributors to her chronic pain. (Tr. 1569). She reported feeling stress and frustration intensified by family stress as well as panic and anxiety attacks, one of which prompted her to visit an emergency room. (Tr. 1569-70). She was prescribed medication and referred for therapy. (Tr. 1573). In a sleep study, the neurologist concluded her pain was associated with psychological and physical factors. (Tr. 1567-68). She underwent a similar evaluation in December 2022. (Tr. 1950).

Ms. Stabler had been undergoing psychotherapy even before the 2022 referral with little progress. (*See, e.g.*, Tr. 2377, 2400, 2049, 2418, 2428, 2437). Through 2023, she continued to have anxious, angry, or irritable moods; depression; preoccupied or ruminating thoughts; logical-to-circumstantial thought processes, normal-to-partial insight, insomnia, trouble concentrating, and inconsistent memory. (*See, e.g.*, Tr. 2175, 2185, 2290, 2300, 2688, 2679-80, 2727, 2890, 2896, 2907, 2943, 2951, 2959, 2967).

---

[1]     Ms. Stabler challenges the ALJ's evaluation of her physical impairments and the medical opinions. (*See* ECF #10 at PageID 3127). Her mental impairments are relevant only to the challenge regarding the medical-source opinions. Thus, I summarize the evidence relating to those impairments only as necessary to understand her physical impairments and the medical opinions.

### III.  Opinion Evidence

On May 5, 2023, state agency medical consultant Elaine Lewis, M.D., opined Ms. Stabler can lift and carry 20 pounds occasionally and 10 pounds frequently; sit, walk, and stand for six hours each in an eight-hour workday; frequently climb ramps and stairs, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and has limited capacity to reach overhead with her right arm. (Tr. 547-48, 561-62). On October 29, 2023, state agency medical consultant Diane Manos, M.D., reviewed updated evidence and affirmed Dr. Lewis's findings. (Tr. 572-73, 581-82).

In March 2023, state agency psychological consultant Ermias Seleshi, M.D., opined Ms. Stabler is:

- moderately limited in understanding and remembering detailed instructions but can understand, remember, and follow simple instructions for routine tasks;

- moderately limited in carrying out detailed instructions, maintaining attention and concentration, and completing a normal workday without interruption from psychological symptoms or need an unreasonable number of breaks, but she can perform routine tasks that do not require fast pace, prolonged close concentration, or high production standards;

- moderately limited in interacting appropriately with the general public and can interact with others on a brief, intermittent, and superficial basis; and,

- moderately limited in responding appropriately to workplace changes but she can adapt in a stable setting with predictable expectations and infrequent changes.

(Tr. 549-50, 563-64). On October 30, 2023, state agency psychological consultant Shannon Ratzburg, Psy.D., reviewed updated records and affirmed Dr. Seleshi's findings. (Tr. 573-74, 582-83).

On May 6, 2023, Ms. Stabler's treating primary-care provider, Dr. Valerie Coats, provided an assessment of her physical functional capacity (Tr. 3075-76). Dr. Coats opined because of Ms.

7

Stabler's pain, range of motion limitations, and arthritis in "multiple areas" of her body, she cannot lift any weight occasionally or frequently; can stand, walk, and sit for less than one hour in a workday; must change positions multiple times a day; can never climb, stoop, crouch, kneel or crawl and can rarely balance; can never reach, push, or pull; can rarely perform fine and gross manipulation (*Id.*). Dr. Coats also opined Ms. Stabler's severe pain would interfere with her concentration, take her off-task, and cause absenteeism and she needs 15-to-30 minutes more rest per hour. (Tr. 3076).

On August 16, 2023, Ms. Stabler underwent a consultative psychological evaluation with Jorethia Chuck, Ph.D., as a part of her application for benefits. (Tr. 2735-40). Dr. Chuck diagnosed Ms. Stabler with major depressive disorder, recurrent episode, with psychotic features and generalized anxiety disorder. (Tr. 2738). Dr. Chuck opined Ms. Stabler (1) "would have problems carrying out complex instructions," (2) "find it difficult to maintain attention and concentration" and "have difficulty carrying out tasks that require her maintain persistence and pace," (3) "should be able to respond appropriately to supervision," and (4) is impaired in "withstand[ing] the stresses and pressures associated with day-to-day work activities" and "her adjustment levels are likely to deteriorate under the pressures of a normal work setting." (Tr. 2739-40).

IV.     **Testimonial Evidence**

Ms. Stabler explained she has not worked since September 2021 because chronic pain in her shoulder, arms, neck, and hands restrict her abilities to reach and bend. (Tr. 518). She was injured while working as a nursing assistant as she transferred a bariatric patient between beds. (Tr. 520-21). She also has spasms in her hands and chest. (Tr. 518). She can write and type, but after about 15-to-20 minutes, her hands will hurt or her muscles will spasm. (Tr. 519).

8

When asked why she never pursued shoulder surgery, Ms. Stabler explained it took over two years to image her shoulder and "after [she] found out what was wrong with it, that's when [surgery] was recommended. But [she] never had the surgery." (Tr. 520). She had been denied multiple times by worker's compensation. (Tr. 521). Eventually, she obtained the imaging under her own health insurance. (Tr. 528-29). No doctor has recommended surgery, though she would pursue it if it were recommended. (Tr. 527).

Ms. Stabler's pain has also worsened her mental health, further reducing her ability to stay focused because she is not as sharp as she once was. (Tr. 524-25). She also is forgetful. (Tr. 527). She is in therapy and takes medications. (Tr. 525). Nevertheless, her emotions can overwhelm her. (*Id.*). She frequently cries. (Tr. 524). She has insomnia, leading to "awful" sleep totaling three-to-six hours a night. (Tr. 527-28).

Ms. Stabler has "a lot of help" in handling cooking, cleaning, and other daily chores from her adult daughter, aunt, uncle, and good friends. (Tr. 526). Though she can bathe, do some food preparation, and wash some dishes, she has help with most dishwashing and taking out the garbage. (Tr. 526-27). She tries to help with chores she can perform while seated. (*See* Tr. 526). When help is absent, she tries to do what she can in increments. (*Id.*).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

9

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this sequential analysis, the claimant has the burden of proof through Step Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. §§ 404.1520(c)-(f), 416.920(c)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Stabler's work after the alleged onset date of September 21, 2022, did not rise to the level of substantial gainful activity. (Tr. 13-14). At Step Two, the ALJ identified six severe impairments: (1) right shoulder osteoarthritis, (2) degenerative disc disease of the thoracic and cervical spine, (3) pain disorder associated with psychological and physical factors, (4) anxiety disorder, (5) depressive disorder, and (6) post-traumatic stress disorder

10

(PTSD). (Tr. 14). At Step Three, the ALJ found Ms. Stabler's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 14-16). At Step Four, the ALJ determined Ms. Stabler's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except: the claimant could never climb ladders, ropes, or scaffolds. She could perform frequent climbing ramps, or stairs, stooping, kneeling, crouching, or crawling. The claimant could perform frequent right-sided reaching overhead. The claimant can perform work tasks that do not require hourly production quotas; can interact with others sufficiently to accept supervision, to ask for clarification of instructions, help others and use hand gestures for pointing or directing where items may be placed, and can adapt to occasional changes in work duties.

(Tr. 16) (cleaned up). The ALJ found Ms. Stabler cannot perform her past relevant work as a nurse assistant. (Tr. 21). At Step Five, the ALJ found Ms. Stabler could perform other work, including as a router, order caller, and cleaner/housekeeper. (Tr. 21-22). Thus, the ALJ concluded Ms. Stabler was not disabled. (Tr. 22).

**STANDARD OF REVIEW**

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective

11

reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters*, 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000,

2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

DISCUSSION

Ms. Stabler argues the ALJ erred in three ways: (1) by finding Ms. Stabler's diabetes and plantar fasciitis were not severe impairments, (2) by improperly evaluating her capacity to reach overhead with her right arm, and (3) in evaluating the opinions of Dr. Coats, her treating physician, and Dr. Chuck, the consultative psychological examiner. (*See* ECF #10 at PageID 3117-18). I address each in turn.

**I.      Any error at Step Two in finding impairments non-severe was harmless because the non-severe impairments were considered later.**

Ms. Stabler first argues the ALJ erred at Step Two by finding her diabetes and plantar fasciitis were not "severe" impairments because the ALJ's reasoning is self-contradictory and the record strongly supports finding those impairments are severe. (ECF #10 at PageID 3118-20). The Commissioner responds that any such error is harmless because the ALJ considered Ms. Stabler's diabetes and plantar fasciitis alongside her severe impairments and substantial evidence supports finding those impairments are non-severe. (ECF #12 at PageID 3135-36). I agree with the Commissioner that any error at Step Two would be harmless.

In the Sixth Circuit, the severity determination is "a de minimis hurdle in the disability determination process." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Id*. The goal of the test is to "screen out totally groundless claims." *Farris v. Sec'y of Health & Hum. Servs.*, 773 F.2d 85, 89 (6th Cir. 1985).

Because a claim continues after the ALJ finds at least one impairment is severe, "[t]he fact that some of [a claimant's] impairments were not deemed to be severe at step two is . . . legally irrelevant" when other impairments are severe. *See Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020) (quoting *Anthony v. Astrue*, 266 F.App'x 451, 457 (6th Cir. 2008)). Thus, if an ALJ wrongly finds an impairment not to be severe at Step Two, that error would be harmless so long as the ALJ properly considers that non-severe impairment at later steps. *Id.* (citing *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

At Step Two, the ALJ identified six severe impairments: (1) right shoulder osteoarthritis, (2) degenerative disc disease of the thoracic and cervical spine, (3) pain disorder associated with psychological and physical factors, (4) anxiety disorder, (5) depressive disorder, and (6) post-traumatic stress disorder (PTSD). (Tr. 14). At Step Four, the ALJ discussed Ms. Stabler's diabetic foot treatment and plantar fasciitis beginning in February 2024, recounted the findings of a contemporary physical examination, described the plan to treat plantar fasciitis with orthotics, and noted x-rays of Ms. Stabler's right foot showed no stress fractures and only small heel spurs. (*See* Tr. 18). Thus, because the ALJ considered Ms. Stabler's non-severe impairments at Step Four, any error by the ALJ in finding her diabetes or plantar fasciitis to be non-severe was harmless.

I thus decline to order remand on this basis.

## II.  Substantial evidence supports the ALJ's finding that Ms. Stabler can frequently reach overhead with her right arm.

Next, Ms. Stabler argues the ALJ erred in finding Ms. Stabler could frequently reach above her head with her right arm because the ALJ substituted her own judgment for that of the medical-source opinions, all of which found greater limitations in reaching overhead, and the medical record shows Ms. Stabler has pain and a limited range of motion in the right shoulder and arm

14

and is consistent with her limited activities of daily living. (ECF #10 at PageID 3121-23). The Commissioner responds that the ALJ is responsible for crafting the RFC and substantial evidence supports the ALJ's finding that Ms. Stabler can frequently reach overhead on her right side. (ECF #12 at PageID 3136-38).

A claimant's RFC represents the most a claimant can still do despite the physical and mental limitations resulting from the claimant's impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ alone determines a claimant's RFC. *Id.* §§ 404.1546(c), 416.946(c). The RFC must be based on all relevant record evidence, including medical evidence, medical reports and opinions, the claimant's testimony, and statements the claimant made to medical providers. *Id.* §§ 404.1545(a), 416.945(a); *see also Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010). The ALJ's decision "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7 (July 2, 1996). In short, the ALJ must connect the dots between the evidence and the ALJ's conclusion.

I begin with Ms. Stabler's argument that the ALJ "substituted her own opinion with those of medical experts regarding a medical issue." (*See* ECF #10 at PageID 3123) (citing *Furlong v. Comm'r of Soc. Sec.*, No. 1:22-cv-588, 2023 WL 2987821, at *9 (N.D. Ohio Feb. 17, 2023), *report and recommendation adopted*, 2023 WL 4931930 (N.D. Ohio Aug. 2, 2023) and *Meece v. Barnhart*, 192 F.App'x 456, 465 (6th Cir. 2006)). An ALJ must temper the duty to evaluate the medical and other evidence with the temptation to "play doctor" by substituting the ALJ's own medical judgment for that of medical professionals. *See Furlong*, 2023 WL 2987821, at *9 (collecting cases).

15

An ALJ may run afoul of the limitations of her expertise when she rejects a medical opinion without relying on other evidence or authority in the record. *Id.* (citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)). But "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a [RFC]." *Poe v. Comm'r of Soc. Sec.*, 342 F.App'x 149, 157 (6th Cir. 2009). Indeed, social security regulations require the ALJ to consider medical opinions alongside the other evidence. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). Moreover, the regulations require the ALJ assess whether the medical opinions are supported by and consistent with other evidence in the record. *See* 20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2).

Here, the ALJ rejected Dr. Coats's opinion that Ms. Stabler can never reach and the state agency medical consultants' opinions that Ms. Stabler can occasionally reach overhead with her right arm. (*See* Tr. 19). The ALJ found Dr. Coats's opinion unpersuasive "because the restrictions were excessive and inconsistent with the medical evidence, including the claimant's presentation of intact sensation, negative extremity edema, and normal musculoskeletal range of motion during treatment both before her opinion was written and after." (Tr. 19) (citing Tr. 2670, 2972) (cleaned up).

The ALJ found the limitation for occasional reaching overhead in the state agency consultants' opinion unpersuasive for the following reason:

> However, the undersigned does not find persuasive the remaining limitation for occasional reaching overhead with the right upper extremity because the restriction was inconsistent with the bulk of the medical evidence including in particular evidence obtained subsequent to their review. For example, during a May 2022 treatment, the claimant presented with 5/5 right rotator cuff motor strength with resisted external rotation at the side and 5/5 strength with resisted Jobe's maneuver. Although she presented with signs of stiffness on examination, and subjective reports of pain with impingement maneuvers and pain at end-range motion; the right upper

16

extremity was otherwise grossly neurovascularly intact to testing. The physician noted that he reviewed her recent MRI and it did not show any significant tearing in her rotator cuff, but only early degenerative change at the glenohumeral joint. The claimant's physician recommended she continued with conservative treatment and not undergo surgery. In May 2023, the claimant denied experiencing any pain. During a separate May 2023 treatment, the claimant did not show any upper motor neuron signs or active synovitis involving the upper or lower extremity joints. Moreover, there is no evidence in the record showing the claimant underwent any more significant treatment or surgery for her right shoulder or neck complaints after their review. Therefore, their opinions restricting her to occasional overhead reaching are not persuasive.

(Tr. 19) (citations omitted). The ALJ's discussion of these opinions shows the ALJ did not play doctor, but considered the opinions in the context of other evidence in the record as required by regulation. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* 20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2) (an ALJ must assess whether an opinion is supported by or consistent with other evidence in the record). Ms. Stabler separately argues the ALJ erred in evaluating Dr. Coats's opinion and I address that in Section III below.

I now turn to whether substantial evidence supports the ALJ's finding that Ms. Stabler can frequently reach overhead with her right arm. "Frequent[ly]" in the context of an RFC means "between one-thirds and two-thirds of the time." *See* SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). Ms. Stabler argues substantial evidence does not support the ALJ's finding because every medical opinion found greater right-arm limitations and the medical record and her daily activities both support a greater right-arm limitation. (*See* ECF #10 at PageID 3121-23). The Commissioner responds that a claimant must do more than point to evidence in her favor to show a lack of substantial evidence and the ALJ cited treatment notes, imaging showing mild degenerative changes and no tears, and Ms. Stabler's conservative treatment modality. (ECF #12 at PageID 3136-38).

The ALJ most directly discussed Ms. Stabler's capability to reach overhead with her right arm when rejecting the state agency reviewers' opinions that she can occasionally reach overhead with her right arm, as reproduced above. To start, the ALJ discussed treatment notes in May 2022 and 2023. (Tr. 19) (citing Tr. 1983, 2762). In May 2022, a physical examination showed Ms. Stabler had reduced range of motion in her right shoulder when compared to her left, yet "[s]trength testing of the right rotator cuff show[ed] 5/5 strength with resisted external rotation at the side and 5/5 strength with resisted Jobe's maneuver" though "[t]here [was] pain with resisted Jobe's maneuver."[2] (Tr. 1983). In May 2023, Dr. Coats recorded Ms. Stabler's pain level at "0/10." (Tr. 2762; *see also* Tr. 2756). Physical examination findings that Ms. Stabler has full muscle strength in her right arm, though with pain, and that she had no pain on at least one occasion and at the same time as the first state agency reviewer's opinions is substantial evidence that her right arm is less limited than opined.

Next, the ALJ cited the May 2023 interpretation by Ms. Stabler's physician of an August 2021 MRI that did "not show any significant tearing in her rotator cuff" though she "does have early degenerative change at the glenohumeral joint."[3] (Tr. 1983). Ms. Stabler seemingly does not contest that MRIs of her shoulder can indicate her arm limitation as she points to that same August 2021 MRI as proof of greater limitation. (*See* ECF #10 at PageID 3122) (citing Tr. 1831).

---

[2]     Jobe's maneuver (or empty-can test) is a common physical test for evaluating a tear or pathology in the supraspinatus muscle (a part of the rotator cuff) where pain suggests a rotator-cuff pathology. *See* Surangkana Katepun et al., *Reliability of the Single-Arm and Double-Arm Jobe Test for the Diagnosis of Full-Thickness Supraspinatus Tendon Tear*, Orthopaedic J. of Sports Medicine (Aug. 3, 2023), http://pmc.ncbi.nlm.nih.gov/articles/PMC10402285/ (last accessed May 1, 2026).

[3]     The glenohumeral joint is "a ball-and-socket synovial joint between the head of the humerus and the glenoid cavity of the scapula," where the arm and shoulder meet. *See* Glenohumeral Joint, Stedmans Medical Dictionary 463600 (Nov. 2014) (last accessed May 1, 2026).

But the same piece of evidence can be substantial evidence in support of both greater or lesser limitations. When the same evidence "can go either way," the standard of review defers to the ALJ. *See Mullen*, 800 F.2d at 545 (holding such a scenario falls squarely within the Commissioner's "zone of choice" to act free of court interference).

Last, the ALJ noted Ms. Stabler pursued conservative treatment and not surgery on Dr. Coats's recommendation. (Tr. 19) (citing Tr. 1983). There, Ms. Stabler's doctor recommended "non-operative management" consisting of "activity modification as needed, oral anti-inflammatories as needed, repeat cortisone injections as needed and physical therapy," to which Ms. Stabler agreed. (Tr. 1983). Conservative treatment modalities for a condition, such as non-narcotic pain medication, physical therapy, and non-surgical treatment, can be substantial evidence that the condition is not disabling. *See Ouellette v. Comm'r of Soc. Sec.*, No. 1:25-cv-1841, 2026 WL 787991, at *5 (N.D. Ohio Mar. 20, 2026); *see also McKenzie v. Comm'r of Soc. Sec.*, 2000 WL 687680, at *4, 215 F.3d 1327 (table) (6th Cir. May 19, 2000) ("Plaintiff's complaints of disabling pain are undermined by his non-aggressive treatment."). There is no argument or indication in the record that Ms. Stabler could not receive surgery for some other reason. *See Campbell v. Comm'r of Soc. Sec.*, No. 5:21-cv-1780, 2022 WL 10110796, at *10 (N.D. Ohio Oct. 5, 2022) (finding claimant's decision to hold off on injections was not substantial evidence when the claimant was waiting for outside approval), *report and recommendation adopted*, 2022 WL 9997400 (N.D. Ohio Oct. 17, 2022).

Ms. Stabler does not argue these pieces of evidence are inadequate to support the ALJ's finding that she can frequently raise her arm overhead. Indeed, both she and the ALJ rely on the same August 2021 MRI to support different conclusions. Rather, she argues other evidence,

including physical examinations, a September 2020 spine MRI, the August 2021 MRI, and her daily activities provided greater support than the evidence on which the ALJ relied. (*See* ECF #10 at PageID 3121-23). But even if Ms. Stabler can point to substantial evidence supporting her conclusion (*i.e.*, that she cannot raise her right arm overhead between one-third and two-thirds of the time), this alone does not entitle her to remand. She must show the ALJ's conclusions are not supported by substantial evidence. *Jones*, 336 F.3d at 477. To show lack of substantial evidence, Ms. Stabler must show "there is not sufficient evidence in the record that would allow a reasoning mind to accept the ALJ's conclusion." *Greene ex rel. Greene v. Astrue*, No. 1:10-cv-0414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010). Here, she has not shown how the different examination notes on which the ALJ relied, the same MRI, or her conservative treatment modality are inadequate evidence. At most, she has shown substantial evidence also supports that she can occasionally reach overhead with her right arm. But the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

I thus decline to order remand on this basis.

### III.  The ALJ properly evaluated Dr. Coats's and Dr. Chuck's opinions.

Third, Ms. Stabler argues the ALJ erred in evaluating the opinions of Drs. Coats and Chuck. (ECF #10 at PageID 3124). I discuss each argument in turn.

#### A.  Substantial evidence supports the ALJ's analysis of Dr. Coats's opinion.

As to Dr. Coats's opinion, Ms. Stabler argues the ALJ's rationale misstates evidence and discredits the opinion because of a lack of edema (swelling) in the arms when her conditions would not cause swelling in the arms and the ALJ conflated her full sensation with a lack of pain. (ECF #10 at PageID 3124). The Commissioner responds the ALJ properly analyzed Dr. Coats's

opinion, applied the supportability and consistency factors, and substantial evidence supports the

ALJ's findings. (ECF #12 at PageID 3138-39).

The ALJ analyzed Dr. Coats's opinion as follows:

In May 2023, Valerie Coats, M.D., issued a medical opinion restricting the claimant to not being able to lift any weight. She could stand or walk for less than 1 hour, in an 8-hour day. She could never climb, stoop, crouch, kneel, or crawl and rarely balance. She could never reach, push, or pull and rarely perform handling or fingering. She should avoid moving machines and temperature extremes. The claimant would require 15-30 minutes of additional rest time during the workday. The undersigned does not find Dr. Coat's assessment was persuasive because the restrictions were excessive and inconsistent with the medical evidence, including the claimant's presentation intact sensation, negative extremity edema, and normal musculoskeletal range of motion during treatment both before her opinion was written and after. The limitations were also unsupported by the specific medical evidence relied upon.

(Tr. 19) (citations omitted).

Ms. Stabler first asserts that negative extremity edema (*i.e.*, no swelling) is not inconsistent

with her conditions because swelling is not a symptom of cervical spine degeneration, arthritis, or a

tear in her shoulder. (ECF #10 at PageID 3124). The Court has no medical expertise or evidence

on which to evaluate this argument. But, presuming Ms. Stabler is correct, the other reasons the

ALJ offered still constitute substantial evidence. *See Jones*, 336 F.3d at 477 (holding the court

cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ"

even if substantial evidence or even a preponderance of the evidence supports the claimant's

position).

The ALJ also found Dr. Coats's opinion was inconsistent with Ms. Stabler's "intact

sensation" and "normal musculoskeletal range of motion during treatment both before her

opinion was written and after." (Tr. 19). While Ms. Stabler is correct that intact sensation does not

mean she does not suffer chronic pain (*see* ECF #10 at PageID 3124), intact sensation is

21

inconsistent with Dr. Coats's opinion that Ms. Stabler can rarely handle and finger. *Russell v. Kijakazi*, No. 1:20-cv-546, 2021 WL 4441711, at *13 (N.D. Ohio Sept. 28, 2021) ("Dr. Lechner's opinion that Plaintiff was severely limited with regard to fine manipulation was inconsistent with her findings that Plaintiff had only decreased sensation to light touch in her finger tips"). Ms. Stabler also argues she "consistently presented with restricted ranges of motion and strength deficits in her upper extremities." (ECF #10 at PageID 3124) (citing Tr. 1777, 1782, 1778, 1928, 1933). Those examinations do show various reduced ranges of motion but also "4/5 motor strength [right upper extremity]," which supports some limitation but does not support the total inability to lift any weight, reach, push, or pull that Dr. Coats opined. (*See* Tr. 1778-89, 1783-84, 1928-29, 1933-34). Thus, substantial evidence supports both the ALJ's findings that Dr. Coats's opinion was not supported by and inconsistent with Ms. Stabler's intact sensation and reduced range of motion and strength.

> **B.      The ALJ reasonably determined Dr. Chuck's opinion was vague.**

As for Dr. Chuck's opinion, Ms. Stabler argues Dr. Chuck's opinion was not vague and, if it was, the ALJ had a duty to resolve the vagueness by obtaining an additional psychological opinion. (ECF #10 at PageID 3125-26). The Commissioner responds the ALJ may properly discount Dr. Chuck's opinion as vague for not proposing specific limitations using programmatic language and the ALJ further found the opinion inconsistent with other normal mental status examinations in the record. (*Id.* at PageID 3140-41).

The ALJ assessed Dr. Chuck's opinion as "vague, imprecise, and undefined terms and did not properly quantify the claimant's abilities or limitations." (Tr. 20). The vagueness of a medical opinion is a valid factor on which the ALJ may rely in assessing supportability and consistency. *See*

22

*Quisenberry v. Comm'r of Soc. Sec.*, 757 F.App'x 422, 434 (6th Cir. 2018) (affirming the ALJ's conclusion where discounted opinion was "quite vague"); *Katelyn M. v. Comm'r of Soc. Sec.*, No. 2:23-cv-12276, 2024 WL 4124675, at *10 (E.D. Mich. Sept. 9, 2024) ("[A]n ALJ can properly discount the weight of an expert opinion when it is too vague and does not support specific functional limitations."). District courts in the Sixth Circuit have determined a medical opinion is vague when it does not propose specific functional limitations. *See, e.g., Hollis v. Comm'r of Soc. Sec.*, No. 1:25-cv-867, 2026 WL 41113, at *11 (N.D. Ohio Jan. 7, 2026), *report and recommendation adopted*, 2026 WL 243912 (N.D. Ohio Jan. 29, 2026); *Von Boeselager v. Comm'r of Soc. Sec.*, No. 1:25-cv-1018, 2026 WL 959224, at *12 (N.D. Ohio Apr. 9, 2026).

Dr. Chuck did not propose any specific functional limitations in Ms. Stabler's abilities to understand, remember, or carry out instructions; maintain attention, concentration, persistence and pace to perform tasks; or respond appropriately to work pressures. Rather, Dr. Chuck opined Ms. Stabler "would have problems carrying out complex instructions," "find it difficult to maintain attention and concentration," "have difficulty carrying out tasks that require her maintain persistence and pace," "should be able to respond appropriately to supervision," is impaired in "withstand[ing] the stresses and pressures associated with day-to-day work activities," and "her adjustment levels are likely to deteriorate under the pressures of a normal work setting." (Tr. 2739-40). While terms such as "have problems" and "have difficulty" may convey meaning in ordinary parlance, they are vague in the context of social security terminology. *See, e.g., Von Boeselager*, 2026 WL 959224, at *5, 12 (finding "would limit [the claimant's] ability to maintain attention and concentration," "should be able to respond appropriately to supervision," and "adjustment levels are likely to deteriorate under the pressures of a normal work setting" are each

23

vague); *Hollis*, 2026 WL 41113, at *11 (same for "depression would limit [the claimant's] ability to maintain attention and concentration"); *Katelyn M.*, 2024 WL 4124675, at *10 (finding "somewhat impaired" vague). Thus, the ALJ reasonably discounted Dr. Chuck's opinion as vague.

Ms. Stabler next argues the ALJ had a duty to resolve any vagueness by obtaining additional medical opinions regarding Ms. Stabler's mental capacity. (ECF #10 at PageID 3126) (citing *Lashley v. Sec'y of Health & Hum. Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)). Under *Lashey*, the ALJ has a general duty "to fully develop the record" that a reviewing court assesses "on a case by case basis." 708 F.2d at 1051-52. Social Security regulations instruct the agency will recontact a consultative examiner for clarification when the examiner's report is "inadequate or incomplete." 20 C.F.R. §§ 404.1519p(b), 416.919p(b). A consultative examiner's report is not rendered incomplete by the absence of a specific statement about a claimant's RFC. *See* 20 C.F.R. §§ 404.1519n(c)(6), 416.919n(c)(6) (establishing required elements for a complete report). A consultative examiner's failure to clarify a claimant's limitation also does not render a report incomplete. *See Dooley v. Comm'r of Soc. Sec.*, 656 F.App'x 113, 122 (6th Cir. 2016) (finding consultative examiner's report failing to clarify limitation against "excessive" bending, kneeling, or squatting did not render the opinion incomplete). Thus, the ALJ was not obligated by regulation to recontact Dr. Chuck and seek clarification because her opinion, though vague, was not incomplete.

I thus decline to order remand on either basis.

## CONCLUSION

After review of the record, the parties' arguments, and the law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

24

Dated: May 1, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE